**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          jwilner@bursor.com
          jglatt@bursor.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARISA BULLARD and MILA CORRIGAN, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br> v.<br><br>COSTCO WHOLESALE CORP. and NICE-PAK PRODUCTS, INC.,<br><br>      Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Mila Corrigan and Larisa Bullard ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Costco Wholesale Corp. and Nice-Pak Products, Inc. ("Defendants").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated who purchased Kirkland Signature Baby Wipes, Fragrance Free (the "Product")[1], which are unfit for their intended use because they contain unsafe levels of per- and polyfluoroalkyl substances ("PFAS").  The Product is formulated, designed, manufactured, advertised, sold, and distributed by Defendants or its agents to consumers, including Plaintiffs, across the United States.

2.      PFAS are a group of synthetic chemicals known to be harmful to children.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, laboratory studies have shown a number of PFAS-linked toxicological effects and have been associated with thyroid disorders, immunotoxic effects, and various cancers.[2]

3.      Furthermore, the Centers for Disease Control and Prevention ("CDC") outlined a host of health effects associated with PFAS exposure, including liver damage, decreased fertility, and increased risk of asthma.[3]

4.      Despite Defendants' representations to consumers that its Product is "made with Naturally Derived Ingredients" and prominently labeled as baby wipes, independent research

---

[1] Discovery may reveal that additional of Defendant's products are within the scope of this Complaint.  Accordingly, Plaintiffs reserve the right to include additional items identified through the course of discovery.

[2] *See* Alan D. Woolf, M.D., M.P.H., FAAP, & Lauren Zajac, M.D., M.P.H., FAAP., *Report Outlines Health Effects of PFAS Chemicals in Children, Provides Recommendations for Testing*, AM. ACAD. OF PEDIATRICS (Sept. 13, 2022), https://publications.aap.org/aapnews/news/22138/Report-outlines-health-effects-of-PFAS-chemicals?autologincheck=redirected.

[3] *What are the Health Effects of PFAS?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (Jan. 18, 2024), https://www.atsdr.cdc.gov/pfas/health-effects/index.html.

---

1 conducted by Plaintiffs' counsel, utilizing a Department of Defense ELAP-certified laboratory,

2 revealed that the Product contains 3.7 parts per billion (PPB) of PFAS.

3      5.     Accordingly, Plaintiffs bring claims against Defendants individually and on behalf

4 of a class of all others similarly situated for (1) violation of California's Consumers Legal

5 Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (2) violation of California's Unfair Competition

6 Law, Cal. Bus. & Prof. Code § 17200, *et seq.;* (3) violation of California's False Advertising Law,

7 Cal. Bus. & Prof. Code § 17500, *et seq.;* (4) violation of New York Gen. Bus. Law § 349; (5)

8 violation of New York Gen. Bus. Law § 350; (6) breach of express warranty; (7) unjust

9 enrichment; (8) fraud; (9) Fraudulent Concealment or Omission; and (10) Negligent

10 Misrepresentation.

11                                       **PARTIES**

12      6.     Plaintiff Larisa Bullard is a citizen of California who resides in San Ramon,

13 California.  Plaintiff Bullard purchased the Product online through Costco multiple times since

14 January 2022 and as recently as February 2024.  Prior to her purchase, Plaintiff Bullard reviewed

15 the images of the packaging and relied on Defendants' representations, labeling, and packing and

16 saw that the product was warranted as safe for babies and infants, prominently featuring an image

17 of a happy baby, and stating the Product is "made with naturally derived ingredients."  Plaintiff

18 Bullard saw these representations prior to and at the time of purchase and understood them as

19 representations and warranties that the Product was suitable as a safe baby wipe for babies and

20 toddlers, like her children.  Accordingly, Plaintiff Bullard relied on these representations and

21 warranties in deciding to purchase the Product.  As such, those representations and warranties were

22 part of the basis of the bargain, in that she would not have purchased the Product on the same terms

23 had she known those representations were not true.  In making her purchase, Plaintiff Bullard paid

24 a price premium due to the false and misleading claim that the Product is a safe and suitable baby

25 wipe for regular application to babies.  Had Plaintiff Bullard known that the Product contained

26 dangerous levels of toxic PFAS chemicals, and therefore not composed of naturally derived

27 ingredients and safe for young children when used as intended, Plaintiff Bullard would not have

28 purchased the Product or would have purchased it under substantially different terms.  Plaintiff

Bullard did not receive the benefit of her bargain because the Product was not, in fact, safe for use as intended because of the inclusion of PFAS chemicals.

7.     Plaintiff Bullard remains interested in purchasing the Product from Defendants. However, she is unable to determine if the Product is actually safe for her children.  She understands that the composition of the Product may change over time, but as long as Defendants continue to represent the Product as being composed of naturally derived ingredients, suitable for use on young children, when presented with false or misleading information while shopping, she will be unable to make informed decisions about whether the purchase the Product and will be unable to evaluate the different prices between Defendants' Product and competitors' products. Plaintiff Bullard is further likely to be repeatedly mislead by Defendants, unless and until Defendants are compelled to ensure that the Product's marketing as "natural" and safe for young children, is, in fact, true.

8.     Plaintiff Mila Corrigan is a citizen of New York who resides in New York City. Plaintiff Corrigan purchased a pack of Kirkland Signature Baby Wipes, Fragrance Free from Instacart and delivered from a Costco store.  Prior to her purchase, Plaintiff Corrigan reviewed the images of the packaging and relied on Defendants' representations, labeling, and packing and saw that the product was warranted as safe for babies and infants, prominently featuring an image of a happy baby and stating that the Product is "made with naturally derived ingredients."  Plaintiff Corrigan saw these representations prior to and at the time of purchase and understood them as representations and warranties that the Product was suitable as a safe baby wipe for her young child.  Accordingly, Plaintiff Corrigan relied on these representations and warranties in deciding to purchase the Product.  As such, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known those representations were not true.  In making her purchase, Plaintiff Corrigan paid a price premium due to the false and misleading claim that the Product is a safe and suitable baby wipe for regular application to babies.  Had Plaintiff Corrigan known that the Product contained dangerous levels of toxic PFAS chemicals, and therefore not composed of naturally derived ingredients, safe for young children when used as intended, Plaintiff Corrigan would not have purchased the Product would

have purchased it under substantially different terms.  Plaintiff Corrigan did not receive the benefit of her bargain because the Product was not, in fact, safe for use as intended because of the inclusion of PFAS chemicals.

9.      Plaintiff Corrigan remains interested in purchasing the Product from Defendants. However, she is unable to determine if the Product is actually safe for her child.  She understands that the composition of the Product may change over time, but as long as Defendants continue to represent the Product as being composed of naturally derived ingredients, suitable for use on young children, when presented with false or misleading information while shipping, she will be unable to make informed decisions about whether the purchase the Product and will be unable to evaluate the different prices between Defendants' Product and competitors' products.  Plaintiff Corrigan is further likely to be repeatedly mislead by Defendants' product, unless and until Defendants are compelled to ensure that the Product's marketing as "natural" and therefore safe for young children, is, in fact, true.

10.      Defendant Costco Wholesale Corporation ("Costco") is a corporation with its principal place of business in Issaquah, Washington.  Defendant markets, sells, and distributes the Product throughout the contiguous United States, including in California and New York. Defendant manufactured, marketed, and sold the Product at issue at all times during the relevant class period.

11.      Defendant Nice-Pak Products, Inc. ("Nice-Pak") is a New York corporation with its principal place of business at 2 Nice Pak Park Orangeburg, New York 10962.  Nice-Pak manufactures the Product for sale under the Kirkland Signature label at Costco stores throughout the United States, including in California and New York, during the relevant class period.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are more than 100 Class Members, the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Members is a citizen of a state different from at least one Defendant.

13.     This Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves to the benefits of doing business in this District by selling the Product to consumers in this District and by maintaining Costco stores throughout this District. This Court also has personal jurisdiction over Defendants because a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this District and Plaintiff Bullard resides in this District.

## FACTUAL ALLEGATIONS

I.     **Defendants' Baby Wipes**

15.     Defendants manufacture, market, and sell the Kirkland Signature Baby Wipes Fragrance Free in brick-and-mortar Costco stores and online through sites like Amazon, Walmart.com, Costco's website, and delivery services.

16.     The Product is advertised as free from specific chemicals including chlorine, dyes, and phthalates.  In addition, the Product prominently displays to consumers that it is "made with Naturally Derived Ingredients" and features a smiling, happy baby.

[SPACE INTENTIONALLY LEFT BLANK]



17.    Defendants repeat their "natural" representations on the box that consumers take the wipes from:



18. In addition, the Product's description on Costco's website makes repeated claims about the Product's gentle and clean touch on babies' bodies. For example, Defendants create the impression that the Product is clean and gentle by explaining that the wipes are "made with purified water for a gentle clean."[4] Defendants double down on their claims by warranting that the wipes are "[s]pecifically formulated to be extra gentle on your baby's skin" and "[g]ently cleanses and moisturizes sensitive skin."[5]



19. Defendants even refer, in a bold and conspicuous box, to the Product's "[n]aturally derived, skin soothing ingredients" as one of the Product's benefits:

**Ingredients & Benefits**

| Benefits | Ingredients |
| --- | --- |
| Naturally derived, skin soothing ingredients | Purified water, Coco Glucoside, Xanthan Gum, Glyceryl Oleate |
| Helps maintain product purity and freshness | Phenoxyethanol, Sodium Benzoate, Tetrasodium Glutamate Diacetate |
| Helps maintain pH and reduce odor | Citric Acid, Sodium Citrate |

---

[4] Costco.com, *Kirkland Signature Baby Wipes Fragrance Free, 900-count*, available https://www.costco.com/kirkland-signature-baby-wipes-fragrance-free%2C-900-count.product.100801219.html.

[5] *Id.*

20.     Further, by marketing the Product as "baby wipes" and including images of happy, healthy babies, Defendants lead consumers to understand that the Product is safe for parents to use on their young children.

## II.     PFAS Chemicals Are Harmful To Babies And Infants

21.     PFAS chemicals "are man-made chemicals that have been used in industry and consumer products worldwide since the 1940s.  They have been used to make nonstick cookware, water-repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."[6]  PFAS are known as "forever chemicals" because they breakdown slowly, if at all, and accumulate in the human body and the natural environment.[7]

22.     PFAS are often divided into two groups: long chain and short chain, both of which are toxic to humans at the ppb level.[8]  In fact, long chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers due to their health risks.[9]  Regardless of length, research from the U.S. National Toxicology Program suggests that both long chain and short chain PFAS have similar levels of toxicity.[10]

23.     PFAS chemicals have been connected with severe and long-term health consequences.  Erika Schreder, Director of Science at Toxic-Free Future, and Jennifer Dickman, Senior Program Associate of Safer Chemicals, Healthy Families, have explained that [p]rimary

---

[6] Agency for Toxic Substances and Disease Registry, *Per= and Polyfluoroalkyl Substances (PFAS) and Your Health,* U.S. DEP'T OF HEALTH AND HUM. SERVS. (Jan. 18, 2024) *available* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html#:~:text=They%20have%20been%20used%20to,grease%2C%20water%2C%20and%20oil. (last accessed Mar. 4, 2024).

[7] National Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances,* U.S. DEP'T OF HEALTH AND HUM. SERVS. (Dec. 4, 2023), https://www.niehs.nih.gov/health/topics/agents/pfc. (last accessed Mar. 11, 2024).

[8] *Id.*

[9] *Per- and Polyfluoroalkyl Substance (PFAS)*, AM. WATER WORKS ASS'N (Aug. 12, 2019), https://www.awwa.org/Portals/0/AWWA/ETS/Resources/Per-andPolyfluoroalkylSubstances(PFAS)-OverviewandPrevalence.pdf?ver=2019-08-14-090234-873. (last accessed Mar. 12, 2024).

[10] Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, NAT'L INST. OF HEALTH (Jan. 8, 2024), https://ntp.niehs.nih.gov/whatwestudy/topics/pfas (last accessed Mar. 12, 2024).

---

among [PFAS-linked health concerns] are cancer and effects on lipid metabolism, but they also include immune suppression, thyroid disease, and harm to reproduction."[11]

24.     Similarly, Dr. Lina S. Birnbaum, Scholar in Residence at Duke University, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences (NIEH) and National Toxicology Program, stated that "[t]hese toxic chemicals are linked to serious problems like cancer, liver damage, decreased fertility, and asthma. … PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."[12]

25.     Additionally, in children, PFAS has also been linked to "[l]ower antibody response[s] to some vaccines,"[13] thereby rendering children more vulnerable to disease they would otherwise be immune from.

26.     Defendants repeatedly play up the importance of "gentle" cleaning for the consumer's baby's sensitive skin.  Defendants are correct that babies have sensitive skin.  In fact, babies have *particularly* sensitive skin.  "A newborn's skin is significantly thinner and more permeable than that of an adult and can more readily absorb chemicals."[14]  Not surprisingly then, the American Academy of Pediatrics confirm that "[c]hildren are more vulnerable to environmental pollutants like PFAS than adults because of … lower body weight, differences in water and food intake, developing organ systems and longer lifespans during which toxic effects might manifest."[15]  Accordingly, the presence of PFAS in the Product is particularly alarming, as it is designed to be used at infancy and through early childhood.

---

[11] Erika Schreder and Jennifer Dickman, *Take Out Toxics: PFAS Chemicals In Food Packaging* 1-26, 6 (2019), TOXIC FREE FUTURE, *available*, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://toxicfreefuture.org/wp-content/uploads/2019/05/Take-Out-Toxics-Full-Report.pdf. (last accessed Mar. 12, 2024).

[12] *New Study Indicates Toxic Chemicals Used In Take-Out Food Packaging From Popular Food Chains*, ECOLOGY CTR., https://www.ecocenter.org/new-study-indicates-toxic-chemicals-used-take-out-food-packaging-popular-food-chains (last accessed Feb. 23, 2024).

[13] *EGLE Classroom: Introduction to PFAS*, MICH. PFAS ACTION RESPONSE TEAM, https://www.michigan.gov/pfasresponse/faq/categories/pfas-101 (last accessed Feb. 12, 2024)

[14] Sydney Swanson, *EWG's Healthy Living: Quick Tips to Safer Diapers,* ENV'T WORKING GRP., (Dec. 10, 2020) *available* https://www.ewg.org/research/guide-safer-diapers (last accessed Mar. 5, 2024).

[15] Woolf, *supra* note 2.

27.     For that reason, wipes containing PFAS are cause for concern because "[t]he skin in the area around a baby's genitals is even thinner and more susceptible to exposure to potentially harmful chemicals."[16]  For girls, the presence of PFAS in products coming in contact with vaginal tissue adds further concern.  According to expert Alexandra Scranton, "vaginal or vulvar tissue [is] much different and more sensitive than the skin on the rest of [the] body."[17]  This is because "[t]he walls of the vagina are filled with numerous blood vessels and lymphatic vessels, which allow for direct transfer of chemicals into the circulatory system."[18] Accordingly, "[c]hemicals absorbed through the vagina are easily and effectively distributed throughout the body, without being metabolized."[19]

28.     Moreover, according to Jessica Singh of Columbia University's Mailman School of Public Health, "the vagina is an effective delivery route of drugs to the systemic circulation system, suggesting that it could also effectively deliver other compounds like toxic chemicals, to the circulation."[20]  "This is due to the abundance of arteries, blood and lymphatic vessels in the walls of the vagina mucosa, and the fact the absorption through this route bypasses first-pass metabolism, by directly entering the peripheral circulation."[21]  "For instance, vaginal administration of estradiol results in significantly higher blood serum levels compared to oral administration.  Furthermore, vulvar and vaginal tissues are more hydrated and permeable compared to the skin on the rest of the body, which may make these more susceptible to chemical exposure.  Moreover, in addition to systemic exposure, vaginal exposure to chemicals and drugs can also have local effects on vaginal and cervical tissue."[22]

---

[16] Sydney Swanson, *supra* note 13.

[17] Alexandra Scranton, *Chem Fatale: Potential Health Effects of Toxic Chemicals in Feminine Care Products*, 9 WOMEN'S VOICES FOR THE EARTH 4 (2013), https://womensvoices.org/wp-content/uploads/2013/11/Chem-Fatale-Report.pdf.

[18] *Id.*

[19] *Id.*

[20] Jessica Singh, et al., *Tampon Use, Environmental Chemicals and Oxidative Stress in the BioCycle Study*, 18:11 ENV'T HEALTH, 1-9, 2 (2019)

[21] *Id.*

[22] *Id.*

29.     The health risk to infants and babies using wipes with PFAS chemicals becomes even more alarming when understood how frequently they are exposed to those chemicals through ordinary use.  "While it might make you gasp, [a parent will] need about 10,000-12,000 baby wipes yearly."[23]  Each application is a repeated, direct exposure to a small and vulnerable body.

30.     Accordingly, for both boys and girls, this repeated, high, and direct skin exposure creates a sever risk to the baby.  For context, researchers studying the effects of *low* level, repeated exposure of certain PFAS chemicals on the skin of rodents showed "significantly reduced levels of antibodies," demonstrating that PFAS had been absorbed through the skin.[24]

31.     Accordingly, direct PFAS exposure to infants and babies from Defendant's wipes pose a health risk, the likes of which Plaintiffs and Class Members sought to avoid by purchasing Defendant's plant-based, natural-material, toxin-free Products for their babies.

32.     Despite Defendants' claims that the Product is made from naturally derived ingredients, "specifically formulated to be extra gentle" on a baby's sensitive skin, and free from certain harmful chemicals, Defendants omit the fact that its Product contains toxic, PFAS chemicals.

33.     Plaintiffs and the members of the Classes bargained for a product that is made of naturally derived ingredients and were thus deprived of the basis of their bargain when Defendants sold them a Product—intended to be used on babies—containing high levels of toxic PFAS chemical, thereby exposing their babies to potentially sever health consequences.

34.     No reasonable consumer would expect the Product, marketed prominently as a baby product made with naturally derived ingredients for a gentle clean and free from other harmful chemicals to contain non-natural, harmful, toxic PFAS chemicals.  Accordingly, Plaintiffs and the members of the Classes suffered economic injuries as a result of purchasing the Product.

---

[23] Kelly O'Lone, *How Many Baby Wipes You Need – Day/Week/Month/Year Breakdown*, THE PLACE FOR PARENTS, available https://theplaceforparents.com/how-many-baby-wipes-do-i-need/.

[24] Ketura Persellin, *Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion*, ENV'T WORKING GRP. (Jan. 13, 2020) available https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion.

35.     In addition, because the facts concern a critical safety-related deficiency in the Product, Defendants were under a continuous duty to disclose to Plaintiffs and the members of the Classes the true standard, quality, and grade of the Product and to disclose the Product contained substances known to have adverse health effects.  Defendants also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Product as the owner, manufacturer, producer, marketer, and seller of the Product.  Nonetheless, Defendants concealed this material information and affirmatively warranted the opposite.

36.     Although Defendants are in the best and exclusive positions to know the true composition and contents of its Product, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

37.     **WHO:**  Defendants Nice-Pak Products, Inc., and Costco Wholesale Corp.

38.     **WHAT:**  Defendants conduct here was, and continues to be, fraudulent because it omitted and concealed that the Product contains high levels of PFAS—which are widely known to have significant health repercussions.  Thus, Defendants' conduct deceived Plaintiffs and the members of the Classes into believing that the Product was safe for use on babies and infants due to its "naturally derived" ingredients, non-inclusions of PFAS-adjacent, harmful chemicals, and designed to provide gentle cleansing for sensitive skin.  Defendant knew, or reasonably should have known, that this information is material to reasonable consumers, including Plaintiffs and the members of the Classes when they make their purchasing decisions, yet Defendants continued to pervasively and affirmatively warrant and represent that the Product was of a quality and character that it is not.

39.     **WHEN:**  Defendants made material misrepresentations and omissions during the putative class period, including prior to and at the time of Plaintiffs' and the Class Members' purchases, despite Defendants' knowing—or reasonably should have known the risk—that the Product contained PFAS.  Plaintiffs viewed the packaging and advertising of the Product online at purchasing and viewed the representations and warranties made by Defendants on the packaging and corresponding marketing, understanding them to mean precisely what they say—that the

Product is safe for use on babies and infants' sensitive skin because it is made from naturally derived ingredients and free from similar harmful, toxic chemicals.

40. **WHERE:** Defendants' marketing messages were uniform and pervasive throughout California, New York, and the United States, carried through material misrepresentations, warranties, and omissions on its labeling, packaging, and marketing materials.

41. **HOW:** Defendants made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product was made of "naturally derived ingredients," free of toxic chemicals, and therefore safe for use on babies and infants.

42. **WHY IT IS FALSE:** Defendants made material representations and warranties that the Product was made from "naturally derived ingredients," free from various toxic chemicals, and provides a "gentle" clean for baby's sensitive skin. These representations and warranties communicate to reasonable consumers that the Product is safe to use as intended—on babies and infants and does not expose them to harmful, toxic chemicals. However, and although consumers like Plaintiffs purchased the Product for the purpose of purchasing a baby wipe that was free of toxic chemicals to avoid exposing their young children, the Product actually contained high levels of toxic PFAS chemicals, contrary to Defendants' representations.

43. **INJURY:** Plaintiffs and the members of the Classes purchased, and paid a premium, or otherwise paid more for the Product they otherwise would not have—had they known that the Product was not comprised of naturally derived ingredients and contained toxic, harmful chemicals in a Product designed to be applied to babies, infants, and young children.

## III.  Defendant's Misrepresentations And Omissions Are Actionable

44. Plaintiffs and Class Members would not have purchased the Product on the same terms had they known the truth about the Product. At worst, the Product is worthless, as it is marketed as made with natural ingredients, free of toxic chemicals, and safe to use on babies and infants despite containing dangerous levels of PFAS chemicals, thus rending the product unsafe for babies and infants.

45. Plaintiffs and Class Members bargained for wipes that were made from naturally derived ingredients and thereby free of harmful toxins, and were deprived of the basis of their

bargain when Defendants sold them a Product containing PFAS.  Defendants likewise affirmatively and prominently warrant on the front packaging to consumers that harmful chlorine, alcohol, dyes, parabens and phthalates have been excluded from the Product, thereby implying to consumers that it is free of toxic chemicals as the consumers bargained for.  In fact, parabens and phthalates, and PFAS chemicals are so closely linked that they are often grouped together in public discourse and in research, as chemicals known to be harmful to health and avoided where possible.[25]

46.     No reasonable consumer would expect that a baby wipe marketed as being made from naturally derived materials would pose a risk to health, safety, and well-being by containing dangerous levels of PFAS chemicals linked to harmful health effects in babies.  Accordingly, Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Product.

47.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendants were under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Product and to disclose that the Product may contain substances known to have adverse health effects.  Defendants, as manufacturers or parties to a contract to manufacture, thereby providing and approving designs of the product, and as seller and advertiser of the Products, is best situated to know the content of the Products. Nonetheless, Defendants concealed and affirmatively misrepresented the true nature of the Product, as discussed herein.

---

[25] *See* Andrea Michelson, *4 Toxic Chemicals in Makeup, Shampoo, and Household Products—and How to Avoid Them*, Business Insider (Oct. 18, 2021) *available* https://www.businessinsider.com/toxic-chemicals-to-avoid-makeup-shampoo-ingredient-labels-2021-10 (last accessed May 14, 2024) ("PFAS, phthalates, and parabens are just a few of the chemical groups that have long-term effects"); *See* Brian Bienkowski, *PFAS and Phthalate Chemical Exposure Early in Life May Hamper Kids' Lungs*, ENV. HEALTH SCI. (Feb. 6, 2019) *available* https://www.ehn.org/pfas-and-phthalate-chemical-exposure-early-in-life-may-hamper-kids-lungs-2628082014.html (last accessed May 14, 2024) ("Children exposed to three different chemical classes—parabens, phthalates and perfluoroalkyl substances (PFAS)—before birth and shortly after had reduced lung function at 6 to 12 years old[.]"); *See* Harrison Wein, Ph.D., *Probing Personal Care Products*, NIH NEWS IN HEALTH (Aug. 2022) *available* https://newsinhealth.nih.gov/2022/08/probing-personal-care-products#:~:text=Many%20chemicals%20of%20concern%2C%20including,brain%2C%20development%2C%20and%20reproduction (last accessed May 14, 2024) ("Many chemicals of concern, including phthalates, parabens, PFAS … are endocrine disruptors.").

48.     Likewise, Defendants are in the best position to know what content they placed on the Product's packaging and marketing materials during the relevant timeframe.  Defendants are also best positioned to know of the presence of PFAS in its product and failed to disclose the existence of these chemicals in the Product to consumers.

## CLASS ALLEGATIONS

49.     ***Nationwide Class.***  Plaintiffs bring this nationwide class action pursuant to rules 23(b), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All persons in the United States who purchased the Product during the statute of limitations period.

50.     ***California Subclass.***  Plaintiff Bullard brings this California Subclass action pursuant to rules 23(b), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of the subclass defined as:

> All persons in the State of California who purchased the Product during the statute of limitations period.

51.     ***New York Subclass.***  Plaintiff Corrigan brings this New York Subclass action pursuant to rules 23(b), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of the subclass defined as:

> All persons in the State of New York who purchased the Product during the statute of limitations period.

52.     Unless otherwise specified, the "Class" and "Class Members" shall refer to the Nationwide Class.  The classes collectively shall be referred to as the "Classes."

53.     Excluded from the Classes are: (1) persons who made such purchases for the purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiffs' counsel and Defense counsel.

54.     ***Numerosity.***  At this time, Plaintiffs do not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members").  However,

given the nature of the claims, Plaintiffs believe that Class and Subclass Members are so numerous that joinder of all members is impracticable.

55.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to members of the Class and Subclasses that predominate over questions that may affect individual Class Members include:

      (a)    Whether the Product contained PFAS;

      (b)    Whether a reasonable consumer would understand Defendant's marketing and packaging to understanding that the Product would be free of harmful, toxic chemicals like PFAS;

      (c)    Whether Defendants misrepresented and/or failed to disclose material facts concerning the Product;

      (d)    Whether Defendants had a duty to disclose the presence of PFAS in its Product;

      (e)    Whether the Product posed a health risk to children and babies thereby rendering it unsafe for its intended use;

      (f)    Whether Defendants' conduct was unlawful;

      (g)    Whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon them by Plaintiffs and the Class and Subclasses;

      (h)    Whether Plaintiffs, the Class, and Subclasses sustained damages with respect to common law claims asserted, and if so, the proper measure of those damages.

56.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendants violated California Civil Code § 1750, *et seq.*, California's Consumers Legal Remedies Act; Business & Professions Code § 17500, *et seq.,* California's False Advertising Law; and Business & Professions Code § 17200, *et seq.*, California's Unfair Competition Law.

57.     With respect to the New York Subclass, additional questions of law and fact common to the members include whether Defendants violated New York Gen. Bus. Law § 349 and New York Gen. Bus. Law § 350.

58.     ***Typicality.***  The claims of the named Plaintiffs are typical of the claims of the Classes because the named Plaintiffs, like other members of the Class and Subclasses, purchased

the Product relying on the representations and warranties made by Defendants on the Product's packaging that the Products were made with naturally derived ingredients, and therefore toxin-free and safe for use on their babies.

59.     ***Adequate Representation.***  Plaintiffs are adequate representatives of the Class Subclasses because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

60.     ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class and Subclasses.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

### CAUSES OF ACTION

### COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

61.     Plaintiff Bullard incorporates the foregoing allegations as if fully set forth herein.

62.     Plaintiff Bullard brings this claim individually and on behalf of the Nationwide Class and California Subclass against Defendants.

63.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"

64.     Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another."

65.     Civil Code § 1770(a)(9) prohibits "advertising goods … with the intent not to sell them as advertised."

66.     Defendants violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as being made from naturally derived ingredients and safe to use on babies when the Product actually contained high levels of toxic, unsafe PFAS chemicals.

67.     Defendants failed to disclose that the Product contains PFAS.

68.     Defendants had exclusive knowledge and/or superior knowledge of the health risks of the Product, which was not known to Plaintiffs or the Classes.

69.     Defendants made material misrepresentations about the Product to Plaintiffs and the members of the Classes while suppressing the true nature of the Product.  Specifically, by displaying that the Product was made of naturally derived ingredients on its packaging and advertising, and displaying in its advertising that the Product is made with purified water, together providing a "[g]entle" clean, when intended to be used on a particularly vulnerable segment of the population (*e.g.,* infants and babies), when the Product actually contained harmful, toxic PFAS chemicals, Defendants affirmatively and materially misrepresented the Product.

70.     Plaintiffs and the Classes have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid and were unknowingly exposed, and exposing their children, to significant and substantial health risks.

71.     On April 15, 2024, prior to the filing of this complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all material respects with California Civil Code § 1782(a).  A second copy of that letter was sent via Federal Express days later, advising Defendants that it was in violation of the CLRA with respect to the presence of PFAS in the Product, and demanding that it cease and desist from such violations and make full restitution by

refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendants confirmed that they received the letter on May 3. 2024.

72.     Defendants failed to remedy the issues raised by the notice letter.

73.     Pursuant to Civ. Code § 1780, Plaintiffs and the Classes seek: (a) actual damages in an amount to be determined at trail; (b) an order enjoining Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by Plaintiffs and the members of the Classes as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

**COUNT II**
**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On Behalf of the Nationwide Class and the California Subclass)**

74.     Plaintiff Bullard incorporates the foregoing allegations as if fully set forth herein.

75.     Plaintiff Bullard brings this claim individually and on behalf of the Nationwide and California Subclass against Defendants.

76.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

77.     Defendants have violated the UCL's proscription against engaging in **<u>Unlawful Business Practices</u>** by violating the CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) as well as by violating California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*.  Likewise, Defendants have violated the UCL's proscription against unlawful conduct by violating New York Gen. Bus. Law §§ 349 and 350.

78.     In addition, as described more fully above, Defendants' misleading marketing, advertising, packaging, and labeling of its Product is likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, *inter alia*, making the presentation and omission of material facts, as set forth more fully above, thereby violating the common law.

79.     Defendants have also violated the UCL's prohibition against engaging in **Unfair Business Practices.**  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein also constitutes "unfair" business acts and practices within the meaning of Bus. & Prof. Code § 17200, *et seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

80.     There were reasonably available alternatives to further Defendants' legitimate business interest, other than the conduct described above.

81.     Defendants have further violated the UCL's proscription against engaging in **Fraudulent Business Practices.**  Defendants' claims, nondisclosures, and misleading statements with respect to the Product, are more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

82.     Plaintiffs and the members of the Classes suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the inclusion of harmful toxins in the Product.

83.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

84.     Plaintiffs and the Members of the Classes had no way of reasonably knowing that the Product they purchased was not marketed, advertised, packaged, or labeled in conformity with Defendants' representations.  Thus, they could not have reasonably avoided the injury each of them suffered.

85.     The gravity of the consequences of Defendants' conduct, as described above, outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other Members of the Classes.

86.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Classes seek an order of this Court that includes, but is not limited to, requiring Defendants to (a) provide restation to Plaintiffs and the other Class Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' attorneys' fees and costs.

**COUNT III**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

87.     Plaintiff Bullard incorporates the foregoing allegations as if fully set forth herein.

88.     Plaintiff Bullard brings this claim individually and on behalf of the Nationwide Class and California Subclass against Defendants.

89.     Defendants' acts and practices, as described herein, have deceived and are likely to continue to deceive members of the Nationwide and California Subclass and the public.  As described throughout this complaint, Defendants misrepresented the Product as being made with naturally derived ingredients and purified water for a gentle application to a baby's sensitive skin, thereby giving the impression to reasonable consumers that the Product is safe to use as intended. However, the Product is not, in fact, safe to use on babies and small children as it contains unsafe PFAS chemicals.

90.     By their actions, Defendants disseminated uniform advertising regarding the Product to and across California and the United States.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*  Such advertisements were intended to and likely did deceive the consuming public.

91.     The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose that the Product contains substances that pose a significant risk to their health.

92.     Defendants continue to misrepresent to consumers that the Product is a safe, gentle, baby wipe made from naturally derived ingredients when, in fact, the Product contains harmful, synthetic, toxic PFAS chemicals.

93.     In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law. Plaintiffs and the Members of the Classes based their purchasing decisions on Defendants' omitted material facts. The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to millions of dollars. Plaintiffs and the Members of the Classes were injured in fact and lost money and property as a result.

94.     The misrepresentation and non-disclosures by Defendants and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

95.     As a result of Defendants' wrongful conduct, Plaintiffs and the Members of the Classes lost money in an amount to be proven at trial. Plaintiffs and the Members of the Classes are therefore entitled to restitution as appropriate for this cause of action.

96.     Plaintiffs and the Classes therefore seek (a) all monetary and non-monetary restitution allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys'' fees and costs under California Code Civ. Proc. 1021.5; (d) injunctive relief, and other appropriate equitable relief.

**COUNT IV**
**Violation of New York General Business Law § 349**
**(On Behalf of the New York Subclass)**

97.     Plaintiff Corrigan incorporates the forgoing allegations as if fully set forth herein.

98.     The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practice.

99.     Defendants market the Product as conferring certain health, safety, and use benefits, when testing demonstrates that the Product actually contains significant levels of unsafe, toxic PFAS chemicals.

100.    Defendants thus has violated, and continue to violate, § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful. As a

direct and proximate result of Defendants' violations of § 349, Plaintiff Corrigan and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

101. Defendants' improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff Corrigan and the New York Subclass members to purchase and pay the requested price for the Product when they otherwise would not have, or would not have purchased as much.

102. Defendants made the untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

103. Plaintiff Corrigan and the New York Subclass members have been injured by their purchase of the Product, which was worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

104. Defendants' advertising induced Plaintiff Corrigan and the New York Subclass members to buy the Product, to buy more of them, and/or to pay the price requested.

105. As a direct and proximate result of Defendants' violations of § 349, Plaintiff Corrigan and the other members of the New York Subclass paid for a false advertised Product and, as such, have suffered damages in an amount to be determined at trial.

106. By reason of the foregoing, Plaintiff Corrigan and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

## COUNT V
### Violation of New York General Business Law § 350
### (On Behalf of the New York Subclass)

107. Plaintiff Corrigan hereby incorporates the foregoing allegations as if fully stated herein.

108. Each of the acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

109. New York General Business Law § 350 declares unlawful any "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state[.]"

110.    NYGBL § 350-a defines "false advertising" in relevant part, as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

111.    Plaintiff Corrigan and the members of the New York Subclass are consumers who purchased Defendants' Product in New York.

112.    As a seller of goods to the consuming public, Defendants are engaged in the conduct of business, trade, or commerce, within the intended ambit of § 350.

113.    Defendants' representations (made by statement, word, design, device, sound, or any combination thereof), and also the extent to which Defendants' advertising has failed to reveal material facts with respect to its Product, as described above, have constituted false advertising in violation of § 350.

114.    Defendants knew, or reasonably should know, that their advertising of the Product is false.  Defendants are the manufacturers, marketers, and sellers of the Product and thereby are privy to the production, marketing, labeling, and production processes that create and put the Product into commerce.  Defendants were in the best position to know of, and test for, the quality and safety of the Product but nonetheless chose to continue their course of marketing regardless.

115.    Defendants' actions led to direct, foreseeable, and proximate injury to Plaintiff Corrigan and the members of the New York Subclass.

116.    As a consequence of Defendants' deceptive marketing scheme, Plaintiff Corrigan and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Product had the truth been known, would not have paid the requested price of the Product and/or would have purchased less of the Product; moreover, as a result of Defendants' conduct, Plaintiff Corrigan and the other members of the New York Subclass received the Product at a lesser value than what they paid for.

117.    By reason of the foregoing, Plaintiff Corrigan and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 350-e(3).

1
2

**COUNT VI**
**Breach of Express Warranty**
**(On Behalf of the Nationwide Class)**

3      118.    Plaintiffs hereby incorporate the foregoing allegations as if fully set forth herein.

4      119.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class under

5   the laws of California.

6      120.    Plaintiffs and the members of the Nationwide Class formed a contract with

7   Defendants at the time of Plaintiffs' and the Nationwide Class members' purchase.

8      121.    The terms of the contract include the promises and affirmations of fact made by

9   Defendants on the Product's packaging and through its marketing and advertising, as described

10  above.

11     122.    This labeling, marketing, and advertising constitutes express warranties and became

12  part of the basis of the bargain and are part of the standardized contract between Defendants,

13  Plaintiffs, and the members of the Nationwide Class.

14     123.    As set forth above, Defendants purport, through their advertising, labeling,

15  marketing, and packaging, to create express warranties that the Product is comprised of naturally

16  derived materials, provides a "gentle" cleaning, and are therefore free of toxic chemicals.

17     124.    Defendants breach their express warranties about the Product and its qualities

18  because, despite their warranties concerning its toxic-free, natural-ingredient composition, the

19  Product is objectively not.  Thus, the Product did not conform to Defendants' affirmations and

20  promises as described above.

21     125.    Plaintiffs and the members of the Nationwide Class would not have purchased the

22  Product had they known the true nature of the Product.

23     126.    As a result of Defendants' breach of express warranty, Plaintiffs and the members of

24  the Nationwide Class suffered, and continue to suffer, financial damage and injury, and are entitled

25  to all damages, in addition to costs, interests and fees, including attorneys' fees.

26
27
28

127.     On May 1, 2024, prior to the filing of this Complaint, Plaintiffs' counsel sent Defendants a notice appraising Defendants of their breach of express warranties.  The letter complained in all respects with U.C.C. §§ 2-313, 2-314, and 2-607.

## COUNT VII
### Unjust Enrichment
### (On Behalf of the Nationwide Class)

128.     Plaintiffs hereby incorporate the foregoing allegations as if fully set forth herein.

129.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class under the laws of California.

130.     To the extent required by the law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

131.     Plaintiffs and the Nationwide Class conferred benefits on Defendants by purchasing the Product.

132.     Defendants were unjustly enriched in retaining the revenues derived from Plaintiffs and the members of the Nationwide Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendants failed to disclose that the Product contained toxic substances, rendering its representations that the Product is comprised of naturally derived ingredients and free of toxic chemicals, false and misleading.  These omissions caused injuries to Plaintiffs and the members of the Nationwide Class because they would not have purchased the Product if the facts were known.

133.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and the members of the Nationwide Class is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

## COUNT VIII
### Fraud
### (On Behalf of the Nationwide Class)

134.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

135.     Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class.

136.     Plaintiffs bring this claim under the laws of the State of California.

137.     At the time Plaintiffs and the members of the Nationwide Class purchased the Product, Defendants did not disclose, but instead concealed and affirmatively misrepresented, that the Product is made of naturally derived ingredients, free from harmful chemicals, and provides a gentle clean on sensitive skin, and is therefore safe to use on babies and infants.

138.     Defendants knew that its omissions and misrepresentations regarding the Product were material and that a reasonable consumer would rely on Defendants' representation and warranties (and corresponding omissions) in making purchasing decisions.

139.     Plaintiffs and the Nationwide Class did not know—nor could they reasonably have known through reasonable diligence—about the true nature of the Product.

140.     Plaintiffs and the Nationwide Class have reasonably relied on Defendants' representations (and corresponding omissions) in making their purchasing decisions.

141.     Plaintiffs and the Nationwide Class have a right to rely on Defendants' representations (and corresponding omissions) as Defendants maintained monopolistic control over the knowledge, design, material, ingredients, and quality of the Product.

142.     Plaintiffs and the members of Nationwide Class sustained damages as a result of their reliance on Defendants' omissions and misrepresentations, thus causing Plaintiffs and the Nationwide Class to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VIIII
### Fraudulent Concealment or Omission
### (On Behalf of the Nationwide Class)

143.     Plaintiffs incorporate the forgoing allegations as if fully set forth herein.

144.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

145.     Plaintiffs bring this claim under the laws of the State of California.

146.     At all relevant times, Defendants were engaged in the business of designing, manufacturing, and selling the Product.

147.     Defendants, acting through its representatives or agents, delivered the Product to its distributors and through online channels to consumers.

148.    Defendants willfully, falsely, and knowingly omitted material information and made material, affirmative misrepresentation regarding the quality and character of the Product as discussed throughout.

149.    Rather than inform consumers of the truth regarding the Product, Defendants misrepresented the quality of the Product as discussed herein at the time of purchase.

150.    Defendants made these material omissions and material, false misrepresentations to boost or maintain sales of the Product, and to false assure purchasers of the Product that its Product is toxin free, made from naturally derived ingredients, and intended to provide a gentle clean for a baby's sensitive skin.  The omitted information and partial representations were material to consumers because the representation played a significant role in the value of the Product purchased.

151.    Plaintiffs and the Nationwide Class had no way of knowing that Defendants' representations were false and misleading.

152.    Although Defendants had a duty to ensure the accuracy of the information regarding the Product because they were in exclusive knowledge of this information, and because the information pertains to matters of health, Defendants did not fulfill that duty.

153.    Defendants misrepresented material facts partly to pad and protect their profits, as they saw that profits and sales of the Product were essential for continued growth and to maintain and grow their reputation as a producer of quality baby wipes products.  Such benefits came at the expense of Plaintiffs and the Nationwide Class.

154.    Plaintiffs and the Nationwide Class were unaware of these material misrepresentations, and they would not have acted as they did, had they known the truth. Plaintiffs' and the Nationwide Class' actions were justified given Defendants' misrepresentations. Defendants were in the exclusive position to control, understand, inquire, and ensure the accuracy of its representations, warranties, and material facts, as such facts were not known to the public.

155.    Due to Defendants' misrepresentations, Plaintiffs and the Nationwide Class sustained injury due to the purchase of the Product that did not live up to its advertised

representations.  Plaintiffs and the Nationwide Class are entitled to recover full refunds for the Product they purchased due to Defendants' misrepresentation.

156.    Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs' and the Nationwide Class' rights and well-being, and in part to enrich themselves at the expense of consumers.  Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products.  Defendants' conduct warrants an assessment of punitive damages in an amount to sufficient to deter such conduct in the future.  Plaintiffs also seek a full refund of their purchase price.

<u>COUNT X</u>
**Negligent Misrepresentation**
**(On Behalf of the Nationwide Class)**

157.    Plaintiffs incorporate the forgoing allegations as if fully set forth herein.

158.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

159.    Plaintiffs bring this claim under the laws of the State of California.

160.    Defendants had a duty to Plaintiffs and the Nationwide Class to exercise reasonable and ordinary care in the developing, testing, manufacturing, marketing, detailing, distribution, and sale of the Product.

161.    Defendants breached their duty to Plaintiffs and the Nationwide Class by development, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiffs and the Nationwide Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendants when they represented and warranted that the Product was safe for use on infants and babies.

162.    Defendants knew or should have known that the qualities and characteristics of the Product was not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not warranted and represented by Defendants.  Specifically, Defendants should have known that by representing and warranting that the Product was comprised of naturally derived ingredients, free of harmful toxins, and thus safe for use on babies and infants,

when the Product actually contained toxic, PFAS chemicals, Defendants should have known that the Product was not safe for use as intended.

163.    As a direct and proximate results of Defendants' conduct, Plaintiffs and the Nationwide Class suffered actual damages in that they would not have purchased the Product had they known that the Product was not safe for use and the Product does not conform to the labeling, packaging, advertising, representations, and warranties.

164.    Plaintiffs and the Nationwide Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgement against Defendant as follows:

(a)    For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Classes, and Plaintiffs' attorneys as Class Counsel;

(b)    For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in the amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper;

(h)    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  June 20, 2024                **BURSOR & FISHER, P.A**.

By:    ___/s/ L. Timothy Fisher_____
                    L. Timothy Fisher

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        jwilner@bursor.com
        jglatt@bursor.com

*Attorneys for Plaintiffs*

## CLRA VENUE DECLARATION

I, L. Timothy Fisher, declare as follows:

      1.     I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs. Plaintiff Bullard resides in San Ramon, California.  Plaintiff Corrigan resides in New York City.  I have personal knowledge of the facts set forth in this declaration and as called as a witness, I could and would completely testify thereto under oath.

      2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff Bullard purchased the Product from this District. Additionally, Defendants advertised, marketed, manufactured, distributed, and/or sold the Product at issue to Class Members in this District.

      3.     I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California this June 20, 2024.

                                   */s/ L. Timothy Fisher*
                                    L. Timothy Fisher