**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            jwilner@bursor.com
            jglatt@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARISA BULLARD, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiff,<br><br>         v.<br><br>COSTCO WHOLESALE CORP. and NICE-PAK PRODUCTS, INC.,<br><br>                                    Defendants. | Case No. 3:24-cv-03714-RS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

1    Plaintiff Larisa Bullard ("Plaintiff") brings this action on behalf of herself, and all others

2    similarly situated against Costco Wholesale Corp. and Nice-Pak Products, Inc. ("Defendants").

3    Plaintiff makes the following allegations pursuant to the investigation of her counsel and based

4    upon information and belief, except as to allegations specifically pertaining to herself, which are

5    based on personal knowledge.

6                              **NATURE OF THE ACTION**

7        1.    Plaintiff brings this class action lawsuit on behalf of herself and all others similarly

8    situated who purchased Kirkland Signature Baby Wipes, Fragrance Free (the "Product")[1], which

9    are unfit for their intended use because they contain—or risk containing—unsafe levels of per- and

10   polyfluoroalkyl substances ("PFAS").  The Product is formulated, designed, manufactured,

11   advertised, sold, and distributed by Defendants or its agents to consumers, including Plaintiffs,

12   across the United States.

13       2.    PFAS are a group of synthetic chemicals known to be harmful to children.  Because

14   PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed,

15   laboratory studies have shown a number of PFAS-linked toxicological effects and have been

16   associated with thyroid disorders, immunotoxic effects, and various cancers.[2]

17       3.    Furthermore, the Centers for Disease Control and Prevention ("CDC") outlined a

18   host of health effects associated with PFAS exposure, including liver damage, decreased fertility,

19   and increased risk of asthma.[3]

20       4.    Despite Defendants' representations to consumers that their Product is "made with

21   Naturally Derived Ingredients" and prominently labeled as baby wipes, independent research

22

23   [1] Discovery may reveal that additional of Defendant's products are within the scope of this
     Complaint.  Accordingly, Plaintiffs reserve the right to include additional items identified through
24   the course of discovery.

25   [2] *See* Alan D. Woolf, M.D., M.P.H., FAAP, & Lauren Zajac, M.D., M.P.H., FAAP., *Report
     Outlines Health Effects of PFAS Chemicals in Children, Provides Recommendations for Testing*,
26   AM. ACAD. OF PEDIATRICS (Sept. 13, 2022),
     https://publications.aap.org/aapnews/news/22138/Report-outlines-health-effects-of-PFAS-
     chemicals?autologincheck=redirected.

27   [3] *What are the Health Effects of PFAS?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY
     (Jan. 18, 2024), https://www.atsdr.cdc.gov/pfas/health-effects/index.html.
28

---

conducted by Plaintiff's counsel, utilizing a Department of Defense ELAP-certified laboratory, revealed that the Product contains 3.6 parts per billion of perfluoropropionic acid, 0.15 parts per billion of PMPA, and 0.040 parts per billion of R-EVE (collectively, "The Chemicals").

5.      The risk is compounded by the fact that the average parent will need about 10,000-12,000 baby wipes yearly, thereby repeatedly exposing their child to perfluoropropionic acid, PMPA, and E-EVE **between 27 and 32 times per day.**  So regardless of the level of each chemical present, the exposure adds up.  Indeed, when news broke that McDonalds packaging tested positive for organic fluorine—a screening mechanism for PFAS chemicals generally, more than 70,000 people from across the country signed a change.org petition asking McDonalds to remove them from the packaging.  The petition worked.  Surely, if consumers are concerned about indications of general, unnamed PFAS chemicals in their food packaging, parents are concerned about PFAS Chemicals in their baby products.

6.      Accordingly, Plaintiff brings claims against Defendants individually and on behalf of a class of all others similarly situated for (1) violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.;* (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.;* (4) breach of express warranty; and (5) unjust enrichment.

## **PARTIES**

7.      Plaintiff Larisa Bullard is a citizen of California who resides in San Ramon, California.  Plaintiff Bullard purchased the Product online through Costco multiple times since January 2022 and as recently as February 2024.  Prior to her purchase, Plaintiff Bullard reviewed the images of the packaging and relied on Defendants' representations, labeling, and packing and saw that the product was warranted as safe for babies and infants, prominently featuring an image of a happy baby, and stating the Product is "made with naturally derived ingredients."  Plaintiff Bullard saw these representations prior to and at the time of purchase and understood them as representations and warranties that the Product was suitable as a safe baby wipe for babies and toddlers, like her children.  Accordingly, Plaintiff Bullard relied on these representations and warranties in deciding to purchase the Product.  Indeed, those representations and warranties were

part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known the Product contained—or risked containing—toxic The Chemicals. In making her purchase, Plaintiff Bullard paid a price premium due to the false and misleading claim that the Product is a safe and suitable baby wipe for regular application to babies. Had Plaintiff Bullard known that the Product contained—or risked containing—dangerous levels of toxic The Chemicals, and therefore not composed of naturally derived ingredients and safe for young children when used as intended, Plaintiff Bullard would not have purchased the Product or would have purchased it under substantially different terms. Plaintiff Bullard did not receive the benefit of her bargain because the Product was not, in fact, safe for use as intended because of the inclusion—or risk thereof—of The Chemicals.

8.     Plaintiff Bullard remains interested in purchasing the Product from Defendants. However, she is unable to determine if the Product is actually safe for her children. She understands that the composition of the Product may change over time, but as long as Defendants continue to represent the Product as being composed of naturally derived ingredients, suitable for use on young children, when presented with false or misleading information while shopping, she will be unable to make informed decisions about whether to purchase the Product. She will be unable to evaluate the different prices between Defendants' Product and competitors' products. Plaintiff Bullard is further likely to be repeatedly mislead by Defendants, unless and until Defendants are compelled to ensure that the Product's marketing as "natural" and safe for young children, is, in fact, true.

9.     Defendant Costco Wholesale Corporation ("Costco") is a corporation with its principal place of business in Issaquah, Washington. Defendant markets, sells, and distributes the Product throughout the contiguous United States, including in California. Defendant manufactured, marketed, and sold the Product at issue at all times during the relevant class period.

10.     Defendant Nice-Pak Products, Inc. ("Nice-Pak") is a New York corporation with its principal place of business at 2 Nice Pak Park Orangeburg, New York 10962. Nice-Pak manufactures the Product for sale under the Kirkland Signature label at Costco stores throughout the United States, including in California, during the relevant class period.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are more than 100 Class Members, the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Members is a citizen of a state different from at least one Defendant.

12.     This Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves to the benefits of doing business in this District by selling the Product to consumers in this District and by maintaining Costco stores throughout this District. This Court also has personal jurisdiction over Defendants because a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this District and Plaintiff Bullard resides in this District.

**FACTUAL ALLEGATIONS**

**I.      Defendants' Baby Wipes**

14.     Defendants manufacture, market, and sell the Kirkland Signature Baby Wipes Fragrance Free in brick-and-mortar Costco stores and online through sites like Amazon, Walmart.com, Costco's website, and delivery services.

15.     The Product is advertised as free from specific chemicals including chlorine, dyes, and phthalates.  In addition, the Product prominently displays to consumers that it is "made with Naturally Derived Ingredients" and features a smiling, happy baby.



16.    Defendants repeat their "natural" representations on the box that consumers take the wipes from:



1

17.    In addition, the Product's description on Costco's website makes repeated claims

2    about the Product's gentle and clean touch on babies' bodies.  For example, Defendants create the

3    impression that the Product is clean and gentle by explaining that the wipes are "made with

4    purified water for a gentle clean."[4]  Defendants double down on their claims by warranting that the

5    wipes are "[s]pecifically formulated to be extra gentle on your baby's skin" and "[g]ently cleanses

6    and moisturizes sensitive skin."[5]

7

8

9

10

11



12

13

14

15

16    18.    Defendants even refer, in a bold and conspicuous box, to the Product's "[n]aturally

17    derived, skin soothing ingredients" as one of the Product's benefits:

18    Ingredients & Benefits

19

20

| Benefits | Ingredients |
| --- | --- |
| Naturally derived, skin soothing ingredients | Purified water, Coco Glucoside, Xanthan Gum, Glyceryl Oleate |
| Helps maintain product purity and freshness | Phenoxyethanol, Sodium Benzoate, Tetrasodium Glutamate Diacetate |
| Helps maintain pH and reduce odor | Citric Acid, Sodium Citrate |

21

22

23

24

25

26    [4] Costco.com, *Kirkland Signature Baby Wipes Fragrance Free, 900-count*, available
27    https://www.costco.com/kirkland-signature-baby-wipes-fragrance-free%2C-900-
count.product.100801219.html.

28    [5] *Id.*

19.     Defendant further represents that it is keenly aware of the contents of the formula, reminding consumers that "[t]he naturally derived ingredient formula is gentle enough for sensitive, eczema and eczema-prone skin."

20.     Further, by marketing the Product as "baby wipes" and including images of happy, healthy babies, Defendants lead consumers to understand that the Product is safe for parents to use on their young children.  Indeed, these representations are contradicted by the presence—or risk thereof—of The Chemicals.

## II.     PFAS CHEMICALS FOUND IN DEFENDANTS' PRODUCT

21.     Plaintiff's counsel, utilizing a Department of Defense ELAP-certified laboratory, revealed that the Product contains 3.6 parts per billion of perfluoropropionic acid, 0.15 parts per billion of PMPA, and 0.040 parts per billion of R-EVE (collectively, "The Chemicals").

### A.     Perfluoropropionic Acid (PFPrA)

22.     PFPrA found in Defendants' Product is a short chain perfluoroalkyl carboxylic acid (PFCA).  PFCAs are a subclass of PFAS chemicals.  To date, all PFCAs have been found to be toxic and tend to accumulate in plasma, the liver, and kidneys because of their attraction to proteins.

23.     Indeed, as explained by Plaintiff's expert, an internationally recognized leading expert on PFAS toxicity, the toxicity of PFPrA and its salts[6] has been well established since the 1950s and federal exposure, screening, regulatory, and management levels based on toxicity data are well established.  Specifically, Plaintiff's expert, based on the body of research available, has explained that the adverse health effects and toxicity of this class of PFAS are well studied, and the data are consistent across the spectrum of fluorinated chain lengths.[7]  PFPrA, like other PFCAs, disrupt the function of the immune system and is toxic to the liver.  Additionally, data from the

---

[6] Creating a salt compound involves replacing a hydrogen molecule with a positively charged ion such as sodium.

[7] The chain length is determined by the number of carbon atoms in the fluorinated section of the molecule.  A "short-chain" PFAS chemical is typically one with less than six carbon atoms.  A "long-chain" PFAS chemical is typically one with more than six.  For example, perfluorooctanoic acid is considered a "long-chain" PFAS compound because it contains eight carbon molecules, as the name suggests.

U.S. Environmental Protection Agency's ToxCast program revealed that PFPrA impacts multiple aspects of the immune cell response including the expression and activity of important immune signaling molecules. Those impacts can contribute to blunting responses to pathogens like viruses and bacterial infections, and are linked with events leading to autoimmune disease (*e.g.*, thyroid disease and lupus erythematosus) and anti-cancer immune surveillance. No reasonable consumer would purchase Defendant's baby wipes for their child knowing that the Product posed this risk.

24.     PFPrA exposure effects on rodents supports Plaintiff's expert's adverse health findings. In a study concerning validated rodent toxicity data, researchers found that the impact of PFPrA on the rodent liver resulted in increased liver weight. This effect is a hallmark of PFAS toxicity.

25.     Accordingly, Plaintiff's expert noted that the toxicity profile of PFPrA causes adverse health effects similar—if not identical—to other PFAS chemicals. This opinion is strongly supported by other findings from the U.S. Environmental Protection Agency's recent risk assessment for PFPrA, wherein it was concluded that even short term exposure to PFPrA caused a toxicity profile identical to other PFAS chemicals.

26.     So, it should come as no surprise that at least one utility, responding to community concerns about PFPrA in its water supply, set a goal of reducing this compound's prevalence in that supply to 10 parts-per-trillion. For refence, the amount of PFPrA found in Defendants' Product is ***32 times higher than that cap***. At bottom, no reasonable consumer, like Plaintiff, would purchase a baby wipe product that contained—or risked containing PFPrA.

**B.     Perfluoro-2-methoxypropanoic Acid (PMPA) and R-EVE**

27.     PMPA and R-EVE share similar chemicals structures both with themselves and other PFAS chemicals. Indeed, according to Plaintiff's expert, researchers have consistently found similar adverse effects across PFAS compounds that share similar chemical structures. In one example, a toxicity study performed by the U.S. Environmental Protection Agency found that the structurally similar PFECA perfluoro-2-methoxyacetic acid (another PFAS chemical), which is a maternal and developmental toxicant in rats, caused adverse effects similar to those caused by PFOA and HFPO-DA (two related PFAS chemicals).

### III.    PFAS Chemicals Are Harmful To Babies And Infants

28.    PFAS chemicals "are man-made chemicals that have been used in industry and consumer products worldwide since the 1940s.  They have been used to make nonstick cookware, water-repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."[8]  PFAS generally are known as "forever chemicals" because they breakdown slowly, if at all, and accumulate in the human body and the natural environment.[9]

29.    PFAS are often divided into two groups: long chain and short chain, both of which are toxic to humans at the ppb level.[10]  In fact, long chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers due to their health risks.[11]  Regardless of length, research from the U.S. National Toxicology Program suggests that both long chain and short chain PFAS have similar levels of toxicity.[12]

30.    Dr. Lina S. Birnbaum, Scholar in Residence at Duke University, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences (NIEH) and National Toxicology Program, opining on testing finding organic fluorine—a method to screen for the presence of PFAS—explained that PFAS generally "are linked to serious problems like cancer,

---

[8] Agency for Toxic Substances and Disease Registry, *Per= and Polyfluoroalkyl Substances (PFAS) and Your Health,* U.S. DEP'T OF HEALTH AND HUM. SERVS. (Jan. 18, 2024) *available* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html#:~:text=They%20have%20been%20used%20to,grease%2C%20water%2C%20and%20oil. (last accessed Mar. 4, 2024).

[9] National Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances,* U.S. DEP'T OF HEALTH AND HUM. SERVS. (Dec. 4, 2023), https://www.niehs.nih.gov/health/topics/agents/pfc. (last accessed Mar. 11, 2024).

[10] *Id.*

[11] *Per- and Polyfluoroalkyl Substance (PFAS)*, AM. WATER WORKS ASS'N (Aug. 12, 2019), https://www.awwa.org/Portals/0/AWWA/ETS/Resources/Per-andPolyfluoroalkylSubstances(PFAS)-OverviewandPrevalence.pdf?ver=2019-08-14-090234-873. (last accessed Mar. 12, 2024).

[12] Nat'l Toxicology Program, *Per- and Polyfluoroalkyl Substances (PFAS)*, NAT'L INST. OF HEALTH (Jan. 8, 2024), https://ntp.niehs.nih.gov/whatwestudy/topics/pfas (last accessed Mar. 12, 2024).

liver damage, decreased fertility, and asthma. … PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."[13]

31.     Additionally, in children, PFAS has also been linked to "[l]ower antibody response[s] to some vaccines,"[14] thereby rendering children more vulnerable to disease they would otherwise be immune from.

32.     Defendants repeatedly play up the importance of "gentle" cleaning for the consumer's baby's sensitive skin.  Defendants are correct that babies have sensitive skin.  In fact, babies have *particularly* sensitive skin.  "A newborn's skin is significantly thinner and more permeable than that of an adult and can more readily absorb chemicals."[15]  Not surprisingly then, the American Academy of Pediatrics confirm that "[c]hildren are more vulnerable to environmental pollutants like PFAS than adults because of … lower body weight, differences in water and food intake, developing organ systems and longer lifespans during which toxic effects might manifest."[16]  Accordingly, the presence of PFAS in the Product is particularly alarming, as it is designed to be used at infancy and through early childhood.

33.     For that reason, wipes containing PFAS are cause for concern because "[t]he skin in the area around a baby's genitals is even thinner and more susceptible to exposure to potentially harmful chemicals."[17]  For girls, the presence of PFAS in products coming in contact with vaginal tissue adds further concern.  According to expert Alexandra Scranton, "vaginal or vulvar tissue [is] much different and more sensitive than the skin on the rest of [the] body."[18]  This is because "[t]he

---

[13] *New Study Indicates Toxic Chemicals Used In Take-Out Food Packaging From Popular Food Chains*, Ecology Ctr., https://www.ecocenter.org/new-study-indicates-toxic-chemicals-used-take-out-food-packaging-popular-food-chains (last accessed Feb. 23, 2024).

[14] *EGLE Classroom: Introduction to PFAS*, Mich. PFAS Action Response Team, https://www.michigan.gov/pfasresponse/faq/categories/pfas-101 (last accessed Feb. 12, 2024)

[15] Sydney Swanson, *EWG's Healthy Living: Quick Tips to Safer Diapers,* Env't Working Grp., (Dec. 10, 2020) *available* https://www.ewg.org/research/guide-safer-diapers (last accessed Mar. 5, 2024).

[16] Woolf, *supra* note 2.

[17] Sydney Swanson, *supra* note 16.

[18] Alexandra Scranton, *Chem Fatale: Potential Health Effects of Toxic Chemicals in Feminine Care Products*, 9 Women's Voices for the Earth 4 (2013), https://womensvoices.org/wp-content/uploads/2013/11/Chem-Fatale-Report.pdf.

walls of the vagina are filled with numerous blood vessels and lymphatic vessels, which allow for direct transfer of chemicals into the circulatory system."[19] Accordingly, "[c]hemicals absorbed through the vagina are easily and effectively distributed throughout the body, without being metabolized."[20]

34.     Moreover, according to Jessica Singh of Columbia University's Mailman School of Public Health, "the vagina is an effective delivery route of drugs to the systemic circulation system, suggesting that it could also effectively deliver other compounds like toxic chemicals, to the circulation."[21] "This is due to the abundance of arteries, blood and lymphatic vessels in the walls of the vagina mucosa, and the fact the absorption through this route bypasses first-pass metabolism, by directly entering the peripheral circulation."[22] "For instance, vaginal administration of estradiol results in significantly higher blood serum levels compared to oral administration.  Furthermore, vulvar and vaginal tissues are more hydrated and permeable compared to the skin on the rest of the body, which may make these more susceptible to chemical exposure.  Moreover, in addition to systemic exposure, vaginal exposure to chemicals and drugs can also have local effects on vaginal and cervical tissue."[23]

35.     The health risk to infants and babies using wipes with PFAS chemicals becomes even more alarming when understood how frequently they are exposed to those chemicals through ordinary use.  "While it might make you gasp, [a parent will] need about 10,000-12,000 baby wipes yearly."[24]  Each application is a repeated, direct exposure to a small and vulnerable body.

36.     Accordingly, for both boys and girls, this repeated, high, and direct skin exposure to The Chemcials creates a sever risk to the baby.  For context, researchers studying the effects of *low*

---

[19] *Id.*

[20] *Id.*

[21] Jessica Singh, et al., *Tampon Use, Environmental Chemicals and Oxidative Stress in the BioCycle Study*, 18:11 ENV'T HEALTH, 1-9, 2 (2019)

[22] *Id.*

[23] *Id.*

[24] Kelly O'Lone, *How Many Baby Wipes You Need – Day/Week/Month/Year Breakdown*, THE PLACE FOR PARENTS, available https://theplaceforparents.com/how-many-baby-wipes-do-i-need/.

level, repeated exposure of certain PFAS chemicals on the skin of rodents showed "significantly reduced levels of antibodies," demonstrating that PFAS had been absorbed through the skin.[25]

37.    Accordingly, direct exposure to these PFAS chemicals by infants and babies from Defendant's wipes poses a health risk, the likes of which Plaintiff and Class Members sought to avoid by purchasing Defendant's plant-based, natural-material, toxin-free Products for their babies.

38.    Despite Defendants' claims that the Product is made from naturally derived ingredients, "specifically formulated to be extra gentle" on a baby's sensitive skin, and free from certain harmful chemicals, Defendants omit the fact that its Product contained—or risked containing—The Chemicals.

39.    Plaintiff and the members of the Classes bargained for a product that is made of naturally derived ingredients and were thus deprived of the basis of their bargain when Defendants sold them a Product—intended to be used on babies—containing—or that risked containing—high levels of The chemical, thereby potentially exposing their babies to potentially sever health consequences.

40.    No reasonable consumer would expect the Product, marketed prominently as a baby product made with naturally derived ingredients for a gentle clean and free from other harmful chemicals to contain—or risk containing—The Chemicals.  Accordingly, Plaintiff and the members of the Classes suffered economic injuries as a result of purchasing the Product.

41.    In addition, because the facts concern a critical safety-related deficiency in the Product, Defendants were under a continuous duty to disclose to Plaintiff and the members of the Classes the true standard, quality, and grade of the Product and to disclose the Product contained— or risked containing—The Chemicals, which are known to have adverse health effects. Furthermore, Defendants also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Product as the owner, manufacturer,

---

[25] Ketura Persellin, *Study: PFAS Exposure Through Skin Causes Harm Similar to Ingestion*, ENV'T WORKING GRP. (Jan. 13, 2020) available https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion.

producer, marketer, and seller of the Product.  Nonetheless, Defendants concealed this material information and affirmatively warranted the opposite.

42.     Although Defendants are in the best and exclusive positions to know the true composition and contents of its Product, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

43.     **WHO:**  Defendants Nice-Pak Products, Inc., and Costco Wholesale Corp.

44.     **WHAT:**  Defendants conduct here was, and continues to be, fraudulent because it omitted and concealed that the Product contains—or risks containing—high levels The Chemicals—which are widely known to have significant health repercussions.  Thus, Defendants' conduct deceived Plaintiff and the members of the Classes into believing that the Product was safe for use on babies and infants due to its "naturally derived" ingredients and so did not contain, nor risk containing The Chemicals as the Product is designed to provide gentle cleansing for sensitive skin.  Defendants knew, or reasonably should have known, that this information is material to reasonable consumers, including Plaintiff and the members of the Classes when they make their purchasing decisions, yet Defendants continued to pervasively and affirmatively warrant and represent that the Product was of a quality and character that it is not.

45.     **WHEN:**  Defendants made material misrepresentations and omissions during the putative class period, including prior to and at the time of Plaintiff's and the Class Members' purchases, despite Defendants' knowing—or reasonably should have known the risk—that the Product contained The Chemicals.  Plaintiff viewed the packaging and advertising of the Product online at purchasing and viewed the representations and warranties made by Defendants on the packaging and corresponding marketing, understanding them to mean precisely what they say— that the Product is safe for use on babies and infants' sensitive skin because it is made from naturally derived ingredients and free from similar harmful, toxic chemicals.

46.     **WHERE:**  Defendants' marketing messages were uniform and pervasive throughout California and the United States, carried through material misrepresentations, warranties, and omissions on its labeling, packaging, and marketing materials.

47.  **HOW:**  Defendants made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product was made of "naturally derived ingredients," free of toxic chemicals, and therefore safe for use on babies and infants.

48.  **WHY IT IS FALSE:**  Defendants made material representations and warranties that the Product was made from "naturally derived ingredients," free from various toxic chemicals, and provides a "gentle" clean for baby's sensitive skin.  These representations and warranties communicate to reasonable consumers that the Product is safe to use as intended—on babies and infants—and does not expose them, nor risk exposing them, to harmful, toxic chemicals.  However, and although consumers like Plaintiff purchased the Product for the purpose of purchasing a baby wipe that was free of toxic chemicals to avoid exposing their young children, the Product actually contained—or risks containing—The Chemicals, contrary to Defendants' representations.

49.  **INJURY:**  Plaintiff and the members of the Classes purchased, and paid a premium, or otherwise paid more for the Product they otherwise would not have—had they known that the Product was not comprised of naturally derived ingredients and contained (or risked containing) toxic, harmful chemicals in a Product designed to be applied to babies, infants, and young children.

50.  Plaintiff and Class Members would not have purchased the Product on the same terms had they known the truth about the Product.  At worst, the Product is worthless, as it is marketed as made with natural ingredients, free of toxic chemicals, and safe to use on babies and infants despite containing dangerous levels of The Chemicals, thus rending the product unsafe for babies and infants.

51.  Plaintiff and Class Members bargained for wipes that were made from naturally derived ingredients and thus free of harmful toxins.  Plaintiff and members of the Class were deprived of the basis of their bargain when Defendants sold them a Product that contained—or risked containing—The Chemicals.  Defendants likewise affirmatively and prominently warrant on the front packaging to consumers that harmful chlorine, alcohol, dyes, parabens and phthalates have been excluded from the Product, thereby implying to consumers that it is free of toxic chemicals as the consumers bargained for.  In fact, parabens and phthalates, and PFAS chemicals

are so closely linked that they are often grouped together in public discourse and in research, as chemicals known to be harmful to health and avoided where possible.[26]

52.     No reasonable consumer would expect that a baby wipe marketed as being made from naturally derived materials would pose a risk to health, safety, and well-being by containing dangerous levels of PFAS chemicals linked to harmful health effects in babies.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

## CLASS ALLEGATIONS

53.     **Nationwide Class.**  Plaintiff brings this nationwide class action pursuant to rules 23(b), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All persons in the United States who purchased the Product during the statute of limitations period.

54.     **California Subclass.**  Plaintiff brings this California Subclass action pursuant to rules 23(b), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of the subclass defined as:

> All persons in the State of California who purchased the Product during the statute of limitations period.

55.     Unless otherwise specified, the "Class" and "Class Members" shall refer to the Nationwide Class.  The classes collectively shall be referred to as the "Classes."

---

[26] *See* Andrea Michelson, *4 Toxic Chemicals in Makeup, Shampoo, and Household Products—and How to Avoid Them*, Business Insider (Oct. 18, 2021) *available* https://www.businessinsider.com/toxic-chemicals-to-avoid-makeup-shampoo-ingredient-labels-2021-10 (last accessed May 14, 2024) ("PFAS, phthalates, and parabens are just a few of the chemical groups that have long-term effects"); *See* Brian Bienkowski, *PFAS and Phthalate Chemical Exposure Early in Life May Hamper Kids' Lungs*, ENV. HEALTH SCI. (Feb. 6, 2019) *available* https://www.ehn.org/pfas-and-phthalate-chemical-exposure-early-in-life-may-hamper-kids-lungs-2628082014.html (last accessed May 14, 2024) ("Children exposed to three different chemical classes—parabens, phthalates and perfluoroalkyl substances (PFAS)—before birth and shortly after had reduced lung function at 6 to 12 years old[.]"); *See* Harrison Wein, Ph.D., *Probing Personal Care Products*, NIH NEWS IN HEALTH (Aug. 2022) *available* https://newsinhealth.nih.gov/2022/08/probing-personal-care-products#:~:text=Many%20chemicals%20of%20concern%2C%20including,brain%2C%20development%2C%20and%20reproduction (last accessed May 14, 2024) ("Many chemicals of concern, including phthalates, parabens, PFAS … are endocrine disruptors.").

56.     Excluded from the Classes are: (1) persons who made such purchases for the purpose of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's Counsel and Defense counsel.

57.     ***Numerosity.***  At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members").  However, given the nature of the claims, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

58.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to members of the Class and Subclasses that predominate over questions that may affect individual Class Members include:

(a)     Whether the Product contained The Chemicals;

(b)     Whether a reasonable consumer would understand Defendants' marketing and packaging to understanding that the Product would be free of harmful, toxic PFAS Chemicals;

(c)     Whether Defendants misrepresented and/or failed to disclose material facts concerning the Product;

(d)     Whether Defendants had a duty to disclose the presence—or risk thereof—of PFAS in its Product;

(e)     Whether the Product poses a health risk to children and babies thereby rendering it unsafe for its intended use;

(f)     Whether Defendants' conduct was unlawful;

(g)     Whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon them by Plaintiff and the Class and Subclasses;

(h)     Whether Plaintiff, the Class, and Subclasses sustained damages with respect to common law claims asserted, and if so, the proper measure of those damages.

59.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendants violated California Civil Code § 1750, *et seq.*, California's Consumers Legal Remedies Act; Business & Professions Code § 17500, *et seq.,*

1    California's False Advertising Law; and Business & Professions Code § 17200, *et seq.*,

2    California's Unfair Competition Law.

3         60.     ***Typicality.***  The claims of the named Plaintiff are typical of the claims of the Classes

4    because the named Plaintiff, like other members of the Class and Subclasses, purchased the

5    Product relying on the representations and warranties made by Defendants on the Product's

6    packaging that the Products were made with naturally derived ingredients, and therefore toxin-free

7    and safe for use on their babies.

8         61.     ***Adequate Representation.***  Plaintiff is an adequate representative of the Class

9    Subclasses because her interests do not conflict with the interests of the Class Members she seeks

10   to represent, she has retained competent counsel experienced in prosecuting class actions, and she

11   intends to prosecute this action vigorously.  The interests of the Class Members will be fairly and

12   adequately protected by Plaintiff and their counsel.

13        62.     ***Superiority.***  The class mechanism is superior to other available means for the fair

14   and efficient adjudication of the claims of the members of the Class and Subclasses.  Each

15   individual Class Member may lack the resources to undergo the burden and expense of individual

16   prosecution of the complex and extensive litigation necessary to establish Defendants' liability.

17   Individualized litigation increases the delay and expense to all parties and multiplies the burden on

18   the judicial system presented by the complex legal and factual issues of this case.  Individualized

19   litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class

20   action device presents far fewer management difficulties and provides the benefits of single

21   adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

22   Defendants' liability.  Class treatment of the liability issues will ensure that all claims and

23   claimants are before this Court for consistent adjudication of liability issues.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

24        63.     Plaintiff Bullard incorporates the foregoing allegations as if fully set forth herein.

64.    Plaintiff Bullard brings this claim individually and on behalf of the Nationwide Class and California Subclass against Defendants.

65.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"

66.    Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another."

67.    Civil Code § 1770(a)(9) prohibits "advertising goods … with the intent not to sell them as advertised."

68.    Defendants violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as being made from naturally derived ingredients and safe to use on babies when the Product actually contained high levels of toxic, unsafe PFAS chemicals.

69.    Defendants failed to disclose that the Product contains PFAS.

70.    Defendants had exclusive knowledge and/or superior knowledge of the health risks of the Product, which was not known to Plaintiff or the Classes.

71.    Defendants made material misrepresentations about the Product to Plaintiff and the members of the Classes while suppressing the true nature of the Product.  Specifically, by displaying that the Product was made of naturally derived ingredients on its packaging and advertising, and displaying in its advertising that the Product is made with purified water, together providing a "[g]entle" clean, when intended to be used on a particularly vulnerable segment of the population (*e.g.,* infants and babies), when the Product actually contained—or risked containing— The Chemicals, which are known to be harmful, toxic PFAS chemicals.  Defendants affirmatively and materially misrepresented otherwise.

72.    Plaintiff and the Classes have suffered harm as a result of these violations of the CLRA because they incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid had they known they were—or risked—repeatedly exposing their children to The Chemicals.

73.     On April 15, 2024, prior to the filing of this complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all material respects with California Civil Code § 1782(a).  A second copy of that letter was sent via Federal Express days later, advising Defendants that it was in violation of the CLRA with respect to the presence of PFAS in the Product, and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendants confirmed that they received the letter on May 3, 2024.

74.     Defendants failed to remedy the issues raised by the notice letter.

75.     Pursuant to Civ. Code § 1780, Plaintiff and the Classes seek: (a) actual damages in an amount to be determined at trail; (b) an order enjoining Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by Plaintiff and the members of the Classes as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

<u>**COUNT II**</u>
**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On Behalf of the Nationwide Class and the California Subclass)**

76.     Plaintiff Bullard incorporates the foregoing allegations as if fully set forth herein.

77.     Plaintiff Bullard brings this claim individually and on behalf of the Nationwide and California Subclass against Defendants.

78.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

79.     Defendants have violated the UCL's proscription against engaging in <u>**Unlawful Business Practices**</u> by violating the CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) as well as by violating California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

80.     In addition, as described more fully above, Defendants' misleading marketing, advertising, packaging, and labeling of its Product is likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, *inter alia*, making the presentation and omission of material facts, as set forth more fully above, thereby violating the common law.

81.     Defendants have also violated the UCL's prohibition against engaging in **<u>Unfair Business Practices.</u>**  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein also constitutes "unfair" business acts and practices within the meaning of Bus. & Prof. Code § 17200, *et seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

82.     There were reasonably available alternatives to further Defendants' legitimate business interest, other than the conduct described above.

83.     Defendants have further violated the UCL's proscription against engaging in **<u>Fraudulent Business Practices.</u>**  Defendants' claims, nondisclosures, and misleading statements with respect to the Product, are more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

84.     Plaintiff and the members of the Classes suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the inclusion of harmful toxins in the Product.

85.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

86.     Plaintiff and the Members of the Classes had no way of reasonably knowing that the Product they purchased was not marketed, advertised, packaged, or labeled in conformity with Defendants' representations.  Thus, they could not have reasonably avoided the injury each of them suffered.

87.     The gravity of the consequences of Defendants' conduct, as described above, outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other Members of the Classes.

88.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the Classes seek an order of this Court that includes, but is not limited to, requiring Defendants to (a) provide restation to Plaintiff and the other Class Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's attorneys' fees and costs.

**COUNT III**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf of the Nationwide Class and California Subclass)**

89.     Plaintiff Bullard incorporates the foregoing allegations as if fully set forth herein.

90.     Plaintiff Bullard brings this claim individually and on behalf of the Nationwide Class and California Subclass against Defendants.

91.     Defendants' acts and practices, as described herein, have deceived and are likely to continue to deceive members of the Nationwide and California Subclass and the public.  As described throughout this complaint, Defendants misrepresented the Product as being made with naturally derived ingredients and purified water for a gentle application to a baby's sensitive skin, thereby giving the impression to reasonable consumers that the Product is safe to use as intended. However, the Product is not, in fact, safe to use on babies and small children as it contains unsafe PFAS chemicals.

92.     By their actions, Defendants disseminated uniform advertising regarding the Product to and across California and the United States.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*  Such advertisements were intended to, and likely did, deceive the consuming public.

93.     The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose that the Product contains substances that pose a significant risk to their health.

94.     Defendants continue to misrepresent to consumers that the Product is a safe, gentle, baby wipe made from naturally derived ingredients when, in fact, the Product contains—or risks containing—harmful, synthetic, toxic PFAS chemicals.

95.     In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law.  Plaintiff and the Members of the Classes based their purchasing decisions on Defendants' omitted material facts.  The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to millions of dollars.  Plaintiff and the Members of the Classes were injured in fact and lost money and property as a result.

96.     The misrepresentation and non-disclosures by Defendants and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

97.     As a result of Defendants' wrongful conduct, Plaintiff and the Members of the Classes lost money in an amount to be proven at trial.  Plaintiff and the Members of the Classes are therefore entitled to restitution as appropriate for this cause of action.

98.     Plaintiff and the Classes therefore seek (a) all monetary and non-monetary restitution allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code Civ. Proc. 1021.5; (d) injunctive relief, and other appropriate equitable relief.

## COUNT IV
### Breach of Express Warranty
### (On Behalf of the Nationwide Class)

99.     Plaintiff hereby incorporates the foregoing allegations as if fully set forth herein.

100.    Plaintiff brings this claim individually and on behalf of the Nationwide Class under the laws of California.

101.    Plaintiff and the members of the Nationwide Class formed a contract with Defendants at the time of Plaintiff's and the Nationwide Class members' purchase.

102.    The terms of the contract include the promises and affirmations of fact made by Defendants on the Product's packaging and through its marketing and advertising, as described above.

103.    This labeling, marketing, and advertising constitutes express warranties and became part of the basis of the bargain and are part of the standardized contract between Defendants, Plaintiff, and the members of the Nationwide Class.

104.    As set forth above, Defendants purport, through their advertising, labeling, marketing, and packaging, to create express warranties that the Product is comprised of naturally derived materials, provides a "gentle" cleaning, and are therefore free of toxic chemicals.

105.    Defendants breach their express warranties about the Product and its qualities because, despite their warranties concerning its toxic-free, natural-ingredient composition, the Product is objectively not.  Thus, the Product did not conform to Defendants' affirmations and promises as described above.

106.    Plaintiff and the members of the Nationwide Class would not have purchased the Product had they known the true nature of the Product.

107.    As a result of Defendants' breach of express warranty, Plaintiff and the members of the Nationwide Class suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interests and fees, including attorneys' fees.

108.    On May 1, 2024, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a notice appraising Defendants of their breach of express warranties.  The letter complained in all respects with U.C.C. §§ 2-313, 2-314, and 2-607.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

109.    Plaintiff hereby incorporates the foregoing allegations as if fully set forth herein.

110.    Plaintiff brings this claim individually and on behalf of the Nationwide Class under the laws of California.

111.    To the extent required by the law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

112.    Plaintiff and the Nationwide Class conferred benefits on Defendants by purchasing the Product.

113.    Defendants were unjustly enriched in retaining the revenues derived from Plaintiff and the members of the Nationwide Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendants failed to disclose that the Product contained toxic substances, rendering its representations that the Product is comprised of naturally derived ingredients and free of toxic chemicals, false and misleading.  These omissions caused injuries to Plaintiff and the members of the Nationwide Class because they would not have purchased the Product if the facts were known.

114.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the members of the Nationwide Class is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgement against Defendant as follows:

(a)    For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Classes, and Plaintiff's attorneys as Class Counsel;

(b)    For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in the amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper;

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury on all claims so triable.

Dated:  February 28, 2025                **BURSOR & FISHER, P.A**.

By:  <u>*/s/ L. Timothy Fisher*</u>
          L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          jwilner@bursor.com
          jglatt@bursor.com

*Attorneys for Plaintiff*

## CLRA VENUE DECLARATION

I, L. Timothy Fisher, declare as follows:

      1.     I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff. Plaintiff Bullard resides in San Ramon, California.  I have personal knowledge of the facts set forth in this declaration and as called as a witness, I could and would completely testify thereto under oath.

      2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff Bullard purchased the Product from this District. Additionally, Defendants advertised, marketed, manufactured, distributed, and/or sold the Product at issue to Class Members in this District.

      3.     I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California this February 28, 2025.

                                           */s/ L. Timothy Fisher*
                                              L. Timothy Fisher